286 F.3d 1159
 Betty JONES, Plaintiff-Appellant,
v.
Willie WILLIAMS; City of Los Angeles; Michael Akana; Grady Dublin; Richard Ludwig; Chester McMillion; Edward Ortiz; Wilson Wong; Alfonso Reyes; Richard A. Brown; Richard Ginelli; Gary Clarke; Robert Holcomb; David Nila; Richard Selleh; Mark Kroecker; Michael Hillman Michael Downing, individually and in their official capacities, Defendants-Appellees, and
Daryl Gates; Arthur Daedelow; Martina Villalobos, Defendants.
 No. 00-56929.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 5, 2002.
 Filed April 18, 2002.
 
 1
 COPYRIGHT MATERIAL OMITTED Stephen Yagman, Yagman & Yagman & Reichmann, Venice, CA, for the plaintiff-appellant.
 
 
 2
 Janet G. Bogigian, City Attorney's Office, Los Angeles, CA, for the defendants-appellees.
 
 
 3
 Appeal from the United States District Court for the Central District of California, Consuelo B. Marshall, District Judge, Presiding.
 
 
 4
 Before O'SCANNLAIN and SILVERMAN, Circuit Judges, and REED, Jr.,* District Judge.
 
 OPINION
 
 5
 REED, District Judge.
 
 
 6
 This case presents a difficult question: can officers be held liable for an allegedly unlawful search when there is no direct evidence of their individual participation? We conclude that in this case they cannot. This case also presents a difficult situation: a search of a house, pursuant to a warrant, that results in the destruction of personal property. Our reaction to the situation is great sympathy for Betty Jones.
 
 
 7
 On April 1, 1995, officers from the Los Angeles Police Department (hereinafter "LAPD") arrived at Betty Jones's (hereinafter "Jones") house in Los Angeles. The officers were part of "Operation Sunrise," the name given to a massive group of searches in homes to locate weapons and contraband related to various gangs. Jones's house was selected for search because of allegations that certain residents of her house had an affiliation with the 8 Trey Gangster Crips, one of the gangs targeted in Operation Sunrise. These searches were all conducted with warrants. The police were given the criminal history of the people residing in the houses where the raids were to be conducted, and the locations were graded on various risk factors. The police testified that they took different actions based on their understanding of the risk posed at each location.
 
 
 8
 On the morning of the search of Jones's house the officers announced their presence through a bullhorn and with two telephone calls. When the residents did not respond, the officers attempted to break down the door with a sledgehammer. Their first try was unsuccessful, and before they could try again, Jones's son, LeRoy Bowling ("Bowling"), opened the door. The officers entered the house and removed Bowling, William Arnold, and Ronald Dominguez to secure the house. After the house was secured, but before the search was completed, the men were brought back into the house where they sat on the couch and watched the officers continue to search the house. From their vantage point they watched the officers search the living room, and the dining room. The men could see into a hallway, but they could not tell what happened in the bedrooms.
 
 
 9
 When the officers completed their search the house was a mess. The officers did not clean the house before they left. Jones returned from work to find her house in shambles. She filed a complaint with the LAPD about the search, and then filed a lawsuit under 42 U.S.C. § 1983 claiming that the officers had violated her Fourth and Fourteenth Amendment rights by conducting an unreasonable search of her house.
 
 
 10
 At trial the officers testified to the actions they took in the house. The officers admitted that they moved furniture, opened doors and drawers, moved pictures, broke a lock on a closet door, moved clothes and auto parts around, moved knick knacks, photographs, and books, and broke drawers off a dresser. After an eight-day trial, the jury found that none of the officers had searched the house in an unreasonable manner.
 
 
 11
 Jones appeals the verdict,[1] claiming that the district court's failure to give her proposed instructions on group liability deprived her of the inference that, despite the fact no officer took responsibility for the destruction of the living room and causing a urine smell in her iron, all officers could be held liable for these actions if they were part of the searching team. Jones argues that she was permitted by law to have her instructions given to the jury.
 
 ANALYSIS
 
 12
 We review the district court's formulation of the jury instructions for abuse of discretion. Monroe v. City of Phoenix, 248 F.3d 851, 857 (9th Cir.2001). A party is entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence. Jenkins v. Union Pac. R.R. Co., 22 F.3d 206, 210 (9th Cir.1994). The district court must formulate a set of jury instructions that fairly and accurately states the law, covers the issues presented, and is not misleading. Duran v. City of Maywood, 221 F.3d 1127, 1130 (9th Cir. 2000) (per curiam).
 
 
 13
 Jones argues that she needed a jury instruction on group liability because the officers escorted all of the residents out of the house before they began to search, and, therefore, there were no witnesses to contradict the denials of the officers. Jones is specifically concerned that all officers denied responsibility for the condition of the living room, and that all officers denied urinating in the iron. The district court rejected Jones's proposed group liability instructions. On appeal, Jones claims that the district court's rejection of her instructions was reversible error because failure to give the instructions deprived her of the ability to hold the officers liable for the unreasonable search.
 
 1. 42 U.S.C. § 1983
 
 14
 42 U.S.C. § 1983 creates a cause of action against a person who, acting under color of state law, deprives another of rights guaranteed under the Constitution. Section 1983 does not create any substantive rights; rather it is the vehicle whereby plaintiffs can challenge actions by governmental officials. To prove a case under section 1983, the plaintiff must demonstrate that (1) the action occurred "under color of state law" and (2) the action resulted in the deprivation of a constitutional right or federal statutory right. Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). There is no dispute that the officers were acting under color of state law. The dispute in this case was whether the officers unreasonably searched Jones's house in violation of her Fourth and Fourteenth Amendment rights.
 
 
 15
 In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no respondeat superior liability under section 1983. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (rejecting the concept of respondeat superior liability in the section 1983 context and requiring individual liability for the constitutional violation); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.1989) (requiring personal participation in the alleged constitutional violations); May v. Enomoto, 633 F.2d 164, 167 (9th Cir.1980) (holding that section 1983 liability must be based on the personal involvement of the defendant).
 
 
 16
 In Chuman v. Wright, we defined the contours of individual liability further when we stated a plaintiff could not hold an officer liable because of his membership in a group without a showing of individual participation in the unlawful conduct. 76 F.3d 292, 294 (9th Cir.1996). Chuman does not appear to bar any use of a group liability instruction, but does seem to require the plaintiff to first establish the "integral participation" of the officers in the alleged constitutional violation. Id. (quoting Melear v. Spears, 862 F.2d 1177, 1186 (5th Cir.1989))(internal quotations omitted). Chuman clearly states that a "team liability" instruction that does not require any individual liability:
 
 
 17
 is an improper ... alternative ground for liability. It removes individual liability as the issue and allows a jury to find a defendant liable on the ground that even if the defendant had no role in the unlawful conduct, he would nonetheless be guilty if the conduct was the result of a "team effort."
 
 
 18
 Id. at 295. With this legal framework in place, we consider each of Jones's instructions below.
 
 2. Jones's proposed jury instructions
 
 19
 
 a. Proposed Instruction 1:
 
 
 
 20
 When a plaintiff cannot specifically state which defendant police officers engaged in an unreasonable search of a plaintiff's residence, but there is evidence to specify that certain defendants were among the police officers who were inside plaintiff's residence, and the officers agree they are among the officers who were present, the jury can reasonably infer that the named officers were participants in the alleged unlawful conduct.
 
 
 21
 Jones's support for this instruction is Rutherford v. City of Berkeley, 780 F.2d 1444, 1448 (9th Cir.1986).[2] In Rutherford, the plaintiff alleged that four police officers threw him to the ground and punched, kicked, and handcuffed him. Id. The defendants denied assaulting Rutherford but admitted they handcuffed him and placed him under arrest. Id. at 1445. Rutherford was not certain which of the four officers actually punched or kicked him while he was on the ground, but testified that he saw each of their faces while he was being assaulted. Id. There, we held that the district court erred when it granted a directed verdict for defendants because there was sufficient evidence for the jury to reasonably infer that the four officers participated in the beating of Rutherford.
 
 
 22
 In her proposed instruction, Jones asks us to take the holding of Rutherford to an extreme not intended by the court. In Rutherford, the court's focus was on permissible inferences. The court did not indicate that the jury could find against the defendants without finding some personal involvement in the beating. Rather, the court indicated that Rutherford had produced enough evidence to demonstrate the liability of the officers, and the court held that the jury could use Rutherford's testimony as evidence to find some individual participation by each officer in the unlawful conduct. His testimony provided the required link of personal involvement to deprivation of his constitutional rights required to hold an officer liable.
 
 
 23
 In Jones's case there was testimony from individual officers to account for the damage to her house. Richard Ludwig broke a bedroom window when securing the house. Richard Brown moved photos when searching the living room. Alfonso Reyes pried open the locked closet. George Selleh took off the closet doors and did not replace them. Wilson Wong broke down the front door of the house with a sledge-hammer. Robert Holcomb searched the hallway closet without putting all of the items back inside, moved photos from the living room mantel, and broke a drawer from a dresser.[3]
 
 
 24
 Contrary to our decision in Chuman, Jones's proposed instruction would have permitted the jury to find the individual officers liable without also finding that they individually conducted unreasonable searches. There is nothing in the instruction that requires the jury to find that the officers personally participated in the search, or that they were integral to the search in order to find them individually liable. In Chuman, we stated that either integral participation or personal involvement was required before a jury could find officers liable. As written, Jones's instruction is an incorrect statement of law in the Ninth Circuit, and the district court was correct to reject it.
 
 
 25
 Further, the district court let the case go to the jury on the facts presented. This allowed the jury to draw reasonable inferences from the officers' testimony and the other evidence as to whether the officers should be held individually liable, even though the officers denied searching Jones's house unreasonably. Allowing the case to go to the jury followed our holding in Rutherford, in which the jury was allowed to draw inferences about the liability of the individual officers based on Rutherford's testimony. The legal inference in Jones's instruction was adequately covered by the fact that the court submitted the case to the jury, and the instructions given to the jury.
 
 
 26
 Nonetheless, Jones argues strenuously that she needed a "group liability" instruction for two incidents: the condition of the living room and the urine smell in the iron.
 
 
 27
 Even if a group liability instruction could be given in very limited circumstances,[4] Jones's case is not one of them. Jones's testimony about the condition of the living room was that "it was a mess" and that "things were thrown all around — blankets and sheets and pictures and stuffed animals." All officers denied searching the living room unreasonably.
 
 
 28
 Although Jones argues that there was no evidence about the condition of the living room because no one was there to witness the officers' search, the record establishes that Bowling was present in the living room for 30 to 45 minutes while the officers were searching. He testified that he saw them throw stuffed animals on the ground, break picture frames, rip apart the spare bed behind the couch, and generally "trash" the house. Bowling had various interactions with the officers while he was sitting on the couch, but when questioned, he could not identify any individual officer named in this case.
 
 
 29
 The concurrence emphasizes that the house was under the "exclusive control" of the officers, and reasons that this fact makes a group liability instruction proper. The house was under the officers exclusive control in that Bowling, Arnold, and Dominguez were handcuffed and forced to remain on the couch and the officers could do as they pleased. But the house was not under their exclusive control such that the officers were the only ones who knew what occurred during the search. It is in this latter situation that a "group liability" instruction may be proper.
 
 
 30
 We decline to permit an instruction that would invite a jury to find all of the officers liable for an alleged constitutional violation under these facts. Jones had detailed testimony from the officers as to their personal participation in the search. She also had eyewitnesses to the search of the living room, who were unable to identify any of the individual officers. Allowing the jury to find individual officers liable when there is no evidence to link them to specific actions would have been erroneous as a matter of law. Chuman, 76 F.3d at 294. Jones's requested instruction would have gone beyond Rutherford, instead of allowing a permissible inference, it would have afforded an impermissible basis for liability. In Rutherford, the plaintiff could identify the specific officers whom he claimed violated his constitutional rights. Jones could not.
 
 
 31
 The other incident that Jones claimed required a group liability instruction was the urine smell in the iron. Jones claimed that when she went to iron her clothes on Sunday she smelled a funny smell from the iron. When she asked her son, he said he too had smelled it earlier in the day when he had ironed. Jones testified that the smell was that of urine. Only two officers were asked about urinating in the iron. Both officers denied it.
 
 
 32
 The failure of the judge to give a "group liability" instruction with regard to the alleged urination in the iron was not error. See Brewer v. City of Napa, 210 F.3d 1093, 1097 (9th Cir.2000) (stating that failure to give a specific instruction is not error when the instructions taken together properly cover the subject). The judge gave the jury three instructions about supervisory liability,[5] which correctly stated the law that "[a] supervisor may be liable if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir.1991) (en banc) (emphasis in original) (internal quotation marks omitted).
 
 
 33
 The judge also gave instructions that would allow the jury to consider the interplay of two or more officers in a deprivation of constitutional rights. First, the judge gave Jones's "conspiracy instruction.[6] Second, the judge also gave a "concurrent cause" instruction.[7] This instruction allowed the jury to consider whether the actions of more than one officer contributed to a search that was unreasonable.
 
 
 34
 Therefore, if the jury found that an officer had urinated in the iron, it would be able to determine whether a supervisor knew about it but failed to stop it, or whether any officer had in any way encouraged or contributed to it. The jury had instructions that permitted it to find liability for individual officers, instructions that adequately covered the idea of liability for members of a searching team. Because we require individual participation, not simply membership in a team, the failure of the district court to give Jones's proposed instruction was not reversible error.
 
 
 35
 
 b. Proposed Instruction 2:
 
 
 
 36
 No matter whose actions ultimately inflicted the plaintiff's injury, when the deprivation of rights is the result of a team effort all members of the team may be held liable.
 
 
 37
 Jones's instruction relies on Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553 (1st Cir.1989). In Gutierrez-Rodriguez, four police officers shot at the plaintiff as he was driving away from a traffic stop. The court held that under this factual scenario all of the participants could be held to be the proximate cause of plaintiff's injury. Id. at 561. Jones cannot rely on Gutierrez-Rodriguez because her proposed instruction is exactly like the one we rejected in Chuman, which had no requirement of integral participation or individual involvement in the allegedly unconstitutional activity.
 
 
 38
 Jones's proposed "team effort" instruction does not include Chuman's requirement of first finding some integral participation or individual involvement in the unlawful conduct. Therefore, the instruction was an incorrect statement of law in the Ninth Circuit, and the district court was correct in rejecting it.
 
 
 39
 
 c. Proposed Instruction 3:
 
 
 
 40
 An officer who is present until a search is completed and the seized items removed from the premises may be held liable under section 1983. An officer who remains armed on the premises throughout a search may be held liable under section 1983. An officer who guards a detainee outside while a search proceeds may be held liable under section 1983 because his activities are integral to the search and renders [sic] him a participant. An officer who provides backup may be held liable under section 1983.
 
 
 41
 Jones's authority for this instruction is James ex rel James v. Sadler, 909 F.2d 834, 837 (5th Cir.1990). Jones's proposed instruction seeks to hold that officers who fit into these categories are by definition "integral participants." In James, the Fifth Circuit held that the officers who remained armed during the search of the beauty shop were "integral to the search" and, therefore, were participants, rather than just bystanders. Id. The Fifth Circuit did not hold that remaining armed meant that the officers were participants. Rather, because of the factual situation in James, those armed officers played an integral role in the conduct, and therefore could be held liable for her alleged constitutional violations.
 
 
 42
 In this case Jones cannot rely on James to state that simply because an officer remains armed during a search, he is a participant and therefore liable for any violations. The evidence in this case did not indicate that those officers who simply remained outside were integral participants in the "unlawful conduct," that is, the destruction of personal property and the manner in which Jones's house was searched. Therefore, as a matter of law, the district court did not err when it refused to give this instruction.
 
 CONCLUSION
 
 43
 Jones proposed three instructions that were properly rejected by the district court. The permissible inference in her first instruction was covered when the case went to the jury, and the instructions given by the district court adequately covered all of the multiple actor issues in the case. Jones's second instruction was a misstatement of law in the Ninth Circuit. Her third instruction sought to impose liability based simply on the job title, a violation of our requirement that integral participation and individual liability be proved in every case. We reject the idea that simple membership in a group, without personal involvement in and a causal connection to the unlawful act, can create liability under section 1983.
 
 
 44
 The judgment of the district court is AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The Honorable Edward C. Reed, Jr., Senior United States District Judge for the District of Nevada, sitting by designation
 
 
 [1]
 In addition, Jones claims that misconduct on the part of the defense attorney, Paul Paquette ("Paquette"), was so pervasive that it deprived her of a fair trial. This part of the case is disposed of in an unpublished memorandum disposition and is not further discussed here
 
 
 [2]
 The holding inRutherford that expressed a four-part test to determine if the individual officers acted in good faith has since been abrogated by Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). However, the Graham decision has no bearing on the group liability issue.
 
 
 [3]
 Jones argues that she needed a group instruction to be able to hold the officers liable for the conditions of the living room and the urine smell in the steam iron. We address these two alleged incidentsinfra.
 
 
 [4]
 There may be times when a group liability instruction would be proper. Such an instruction would likely mirror a typical "res ipsa loquitur" instruction and require the actions of the police officers to deprive the victim of any chance to learn exactly which officer took what actions in the house. We do not foreclose on the possibility of a group liability instruction ever being given, but this case does not present the factual situation where such an instruction would be legally proper because Jones had eyewitness testimony to the officers search
 
 
 [5]
 The actual text of the three supervisory liability instructions is as follows: (1) "A supervisory police officer may be held liable for actions of subordinates if subordinate wrongdoing is known to the supervisory officer;" (2) "A supervisory official may be held liable in his individual capacity if he approved, condoned, or ratified, or encouraged the kind of unconstitutional conduct of which the complaint is made;" and (3) "A supervisor may be held liable under the Civil Rights Act where it is shown that he participated in or directed the unlawful conduct or if he sets in motion a series of acts by others which he knew or should have known could cause others to inflict the constitutional injury."
 
 
 [6]
 Jones's instruction stated: "Anyone who commands, directs, advises, encourages, procures, instigates, promotes, controls, aids, or abets a wrongful act by another is regarded by the law as being just as responsible for the wrongful act as the one who actually committed it."
 
 
 [7]
 The instruction stated: "[M]any factors or things or the conduct of two or more persons can operate at the same time either independently or together to cause injury or damage and in such a case each may be a proximate cause."
 
 
 
 45
 SILVERMAN, Circuit Judge, concurring in the judgment:
 
 
 46
 I respectfully concur in the result. I write separately because, in my view, the Rutherford instruction submitted by the plaintiff was a correct statement of the law. It was properly refused only because it was not justified by the evidence. Specifically, the evidence at trial was not susceptible of the interpretation that the damage occurred while no one but the officers was present. To the contrary, the residents testified to what they say they witnessed the police officers doing. The police officers gave their opposing version of the story, and it was for the jury to decide which to believe.
 
 
 47
 As a general rule, a res ipsa-type instruction can be given in a case such as this if: first, the defendants are uniquely positioned, to the exclusion of others, to know the circumstances that caused the plaintiff's injury; and second, the injury would not normally occur without wrong-doing on the defendants' part. See Reber v. United States, 951 F.2d 961, 964 n. 1 (9th Cir.1991). Res ipsa belongs to the world of negligence. This case, like Rutherford, involves an intentional constitutional tort. However, the principle of proof is the same. If government actors/defendants, due to circumstances of their own creation, prevent the plaintiff from identifying precisely which of them caused the plaintiff's injury, the jury can infer causation against those in exclusive control of the event. This is just what the proposed Rutherford instruction would have permitted. As I see it, the instruction was correctly refused because it was not supported by the evidence, not because it misstated the law.